Filed 3/24/25  Elizabeth v. Braithwaite CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SIERRA ELIZABETH,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>WARREN BRAITHWAITE,<br><br>    Defendant, Cross-complainant and Respondent. | B336284, B336287<br><br>(Los Angeles County Super. Ct. No. 23STRO04619, 23CHRO01211) |

APPEAL from orders of the Superior Court of Los Angeles County, Michael R. Powell, Judge.  Reversed in part and dismissed in part.

Greines, Martin, Stein & Richland, John J. Metzidis and Cynthia Tobisman for Plaintiff, Cross-defendant and Appellant.

No appearance for Defendant, Cross-complainant and Respondent.

_____

In July 2023, appellant Sierra Elizabeth and her husband respondent Warren Braithwaite each filed a request for a domestic violence restraining order (DVRO) against the other. Both requests were based on the same July 2, 2023 incident. At trial, Braithwaite and Elizabeth offered conflicting accounts of the event, each claiming the other was the aggressor. The court granted Braithwaite's request and denied Elizabeth's.

Braithwaite died while this appeal was pending,[1] rendering it moot. We nevertheless exercise our discretion to consider the merits of Elizabeth's appeal to the extent it addresses the DVRO against her, because she has shown that it is likely to have negative legal and practical consequences for her in the future. We dismiss the remainder of the appeal as moot.

Although Elizabeth challenges the trial court's actions and rulings before, during, and after trial, we conclude that the court's refusal to allow her to present rebuttal evidence to Braithwaite's DVRO request alone requires reversal on due process grounds. Accordingly, we will not discuss her other

---

[1] We grant Elizabeth's motion asking that we take judicial notice of additional evidence bearing on the issue of whether her appeal is moot. (See Code Civ. Proc., § 909 ["reviewing court may . . . for any . . . purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal"]; *In re M.B.* (2022) 80 Cal.App.5th 617, 627 [Code of Civil Procedure section 909 permits appellate courts to take and consider postjudgment evidence "to determine whether an issue on appeal is moot"]; see also *In re D.P.* (2023) 14 Cal.5th 266, 287 (*D.P.*) [Code of Civil Procedure section 909 may be used to "introduce additional evidence in support of discretionary review" of otherwise moot appeal].)

challenges.  And because Braithwaite is deceased, we do not remand for a retrial.

## FACTS AND PROCEEDINGS BELOW

### A.  *The DVRO Requests*

On July 7, 2023, Elizabeth filed a request for a DVRO against Braithwaite.  On July 17, 2023, Braithwaite filed a request for a DVRO against Elizabeth.  The primary basis for each request was a July 2, 2023 incident at the couple's home.

Elizabeth's request describes the events of that night as follows:  [A]round 1:00 a.m., "[u]pon entering [the] home, [Braithwaite] . . . came out of a dark room [and] rushed to [her], took [her] phone [and] slammed it on the ground [and] proceeded to yell at [her]," "curse [her] out, push [her], pull out [her] hair, choke [her], open our oven door [and] turned on the stove threatening to 'blow the house up,' slap [her] in the ear (which resulted in loss of hearing [and] perforated ear drum), [and] pulled a knife out of the butcher block [and] knocked [her] to the ground waving the knife (blade down) over [her] telling [her] he could stab [her].  [He] [o]rdered [her] to sit in [the] kitchen with the knife placed between [them]," then "[o]rdered [her] to get the 'fuck out of the/his house' [and] made [her] start packing [her] things.  This abuse lasted for almost 2.5 hours."  In the section of the DVRO request form asking "[h]ow often. . . [Braithwaite had] abused [her] like this," Elizabeth checked the box for "[o]ther" and provided the following explanation:  "In July 2021, [Braithwaite] threatened me very badly, threw something at me and dragged me off the bed.  There have been other instances of verbal threats to me or about my family that he was going to 'put me in the hospital' but no physical violence."

Braithwaite's DVRO request, by contrast, describes Elizabeth as the aggressor. His request states that Elizabeth came home late on July 2, 2023 and "approached [him] while [she was] under the influence of both alcohol and drugs" and "began insulting [him], cursing at [him] and . . . threatened to harm [him]. Thereafter, she retrieved one of the sharpest knives in the home and cut [him] badly" on his leg. The request attached iPhone screen shots which the request describes as photos of "the knife and injury." In the section asking "[h]ow often has [Elizabeth] abused you like this," Braithwaite checked the box for "[j]ust this once." In the section requesting additional details about the July 2, 2023 incident, however, Braithwaite wrote that he "came home late on 10-14-21 and because [he] didn't answer [Elizabeth's] call she accuse[d] [him] of cheating and pull[ed] a knife on [him] saying she will kill [him] if she finds out [he is] cheating on her."

## B.   *Pretrial Proceedings*

The court ordered the two requests related to each other and to the parties' dissolution of marriage action.

Elizabeth sought discovery related to both her request and Braithwaite's. Among the discovery she sought were native files of the photos attached to Braithwaite's request, so that a forensic expert could examine them and their associated metadata to determine whether they had been "doctored." The court denied the motion without prejudice, instructing Elizabeth to make such motions to the judicial officer ultimately assigned to try the DVRO requests.

At the initial pretrial conference, Elizabeth repeated her discovery requests, but the court denied them. The court also ordered the parties to file supplemental declarations "if they

4

[were] alleging other acts of domestic violence that were not clearly identified within the [DVRO] request for each party." Such supplemental declarations were to "delineat[e] the date, times, and what happened on those occasions" of alleged prior abuse.  Elizabeth filed such a declaration, but Braithwaite did not.

The court set the matter for a three-day trial, set a schedule for disclosing exhibit and witness lists, and required the parties to meet and confer regarding the admissibility of exhibits. The versions of the photographs attached to Braithwaite's DVRO request included in the exhibits Braithwaite identified and served were versions without any date or time identifiers.

C.    *Trial*

1.    **Elizabeth's Case-in-Chief**

On the first day of trial, Elizabeth testified that Braithwaite had been the aggressor, not she.[2]  She also testified that she had never been violent towards Braithwaite.  During cross-examination, Braithwaite's counsel attempted to impeach this testimony by asking whether, in October 2022, Elizabeth had hit Braithwaite on the head during a rooftop event in Miami. Elizabeth denied that this occurred.  Braithwaite's counsel also attempted to impeach Elizabeth's testimony with time-stamped versions of the photographs attached to Braithwaite's DVRO request, which purportedly showed Braithwaite's wounds from the July 2 incident, but the court interposed its own objections

_____

[2] Elizabeth's testimony was extensive, and addressed the incident, as well as other issues.  The details of Elizabeth's testimony, however, do not affect our analysis of the issues on appeal, and we thus only describe it briefly.

5

thereto based on lack of foundation, and the time-stamped photos were not admitted into evidence.

In support of her case, Elizabeth's friend, Jonathan Williams, testified that, on the morning after the incident, he had observed injuries to Elizabeth's person.[3]  Elizabeth's also offered, inter alia, a July 3, 2023 hospital record  which the court "admitted for the truth of the matter," showing she sought treatment for pain in her ear that day, and that the treating physician's "clinical impression" (capitalization omitted) was that she had a "[p]erforation of [the] right tympanic membrane."

## 2.    Braithwaite's Case-in-Chief

Braithwaite's friend, Brenton Brooks, testified to seeing Elizabeth slap Braithwaite at a hotel bar in Miami Beach in October 2022.  Braithwaite's adult son, Tyler,[4] testified that he had witnessed Elizabeth slap and push his father on one occasion, jump on Braithwaite's back on another occasion, and throw a binder at Braithwaite during an argument on a third occasion.

During cross-examination of Tyler, Elizabeth's counsel attempted to introduce evidence of four "restraining orders that ha[d] been issued against [Braithwaite]."  The court excluded the evidence on the ground of improper character evidence, rejecting Elizabeth's argument that they were admissible to show a "scheme" that "[e]very time [Braithwaite] believes that a wife of

---

[3] The court excluded as hearsay Williams's testimony that Elizabeth identified Braithwaite as causing those injuries.

[4] Because Walter Braithwaite and Tyler Braithwaite share the same surname, we refer to the latter by his first name only. No disrespect is thereby intended.

his or girlfriend is cheating on him, he commits acts of domestic violence." In discussions with the court as to whether Elizabeth could lay a proper foundation for admitting the DVROs on this theory, the court stated that Elizabeth would have an opportunity to do so later in the proceedings even though she had rested her case-in-chief, because such evidence would "be rebuttal potentially to [Braithwaite's] . . . testimony" and Elizabeth's counsel "[could] bring witnesses in [Braithwaite's] restraining order [request]" even though she had rested as to her own request.

Braithwaite's oncologist, Dr. James Berenson, testified that during a November 10, 2023 examination, Braithwaite's leg showed a healing cut. Berenson did not opine as to the age of the cut.

During discussions about whether Braithwaite planned to testify, Braithwaite's counsel commented that Braithwaite was still rebutting Elizabeth's case. At that point, the court ordered Braithwaite to begin putting on his case.

Braithwaite testified to his version of the events, including his contention that Elizabeth has been physically violent towards him on several occasions not identified in his DVRO request or via a supplemental declaration. During his testimony, the court asked him about Elizabeth's claim that Braithwaite had "manufactured [the] pictures" of his leg wound and the bloody knife. Braithwaite responded that this was "not true" and that he "took the pictures [that] same night." The court then ascertained that Braithwaite had on his person the phone with which he took the pictures and stated its "intention to look at that phone" after the lunch break. The court confirmed that Elizabeth had never had the opportunity to review the photos on

7

the device, and instructed Braithwaite to "show [Elizabeth] the photos with the associated data about when they were taken," during a lunch-hour "meet and confer."

During the lunch break, Elizabeth's counsel examined Braithwaite's phone in the courthouse hallway.  Counsel took pictures and a video of Braithwaite's phone with the images pulled up.  In this video, counsel documented that the to-the-second time associated with all six photographs ended in :00, namely:  two photos bearing a timestamp of 2:05:00 a.m., two photos bearing a timestamp of 2:06:00 a.m., and two photos bearing a timestamp of 2:07:00 a.m.  After the lunch break, the court announced that it only "wanted to make sure counsel looked at [the phone]" and that the court "[did not] need to see it" after all.

When the trial resumed, Elizabeth's counsel asked Braithwaite whether he recalled a July 7, 2023 phone conversation with Elizabeth during which he stated he "just had a rage" and that he "thought she was cheating and then [he] just lost it."  When Braithwaite denied making these statements, the court did not allow Elizabeth to play the full recording of this conversation, but did permit those portions thereof that directly contradicted Braithwaite's denials.  In the excerpts played for the court, and the transcript thereof, Elizabeth's statement, "the whole reason for [my DVRO request] is because you freaking tried to kill me," is immediately followed by Braithwaite stating, "I'm not going to do anything.  I give you my word."  Upon hearing this,  Braithwaite volunteered that his actual response to Elizabeth's statement was saying, "What?  . . . You cut me," and that this was "missing" from the excerpt played in court.

### 3. The Court Concludes Trial and Announces Its Ruling

After Braithwaite concluded testifying and his counsel indicated he had no further witnesses, the court asked for a copy of Elizabeth's previously admitted July 3 hospital record. The court then took a brief recess.

Upon returning, and without explanation, the court began announcing its ruling. Elizabeth's counsel protested, stating that Elizabeth wanted to present rebuttal evidence responding to Braithwaite's case-in-chief. The court responded: "You have rebuttal? I think I've heard enough evidence." When asked what rebuttal evidence counsel would offer, counsel responded that Elizabeth would again testify. The court responded it would permit Elizabeth to do so. Specifically, the court stated: "You know what? I'll let you put your client up. [¶] . . . [¶] . . . I think I've heard all the evidence, but I'll let her rebut." The court then granted a short recess so that Elizabeth could use the restroom.

Upon returning, however, without explanation, the court did not permit Elizabeth to testify. Instead, the court immediately issued its ruling on both requests, denying Elizabeth's and granting Braithwaite's. In so doing, the court found Elizabeth's version of the July 2 incident to be not credible, identifying as the "big problem" that Braithwaite had presented the testimony of Dr. Berenson attesting to Braithwaite's wound and that "photos [of his wounds] that are time stamped" were "in the exhibits," disproving Elizabeth's contention that the photos were fake or had been manipulated. The court stated that "[t]here could have easily been somebody to produce, you know, some testimony to say this is how this was manipulated or that was manipulated. It wasn't. So I have a wound. I have a wound

9

confirmed by a physician. And she said it never happened. I have pictures that say it happened. [¶] Therefore, I'm left with incompatible information. . . . I don't believe that it never happened. And so I don't find [Elizabeth] credible. And I cannot issue a restraining order against [Braithwaite] because I find [Elizabeth] to be the aggressor."

As an additional basis for its conclusion that Elizabeth's testimony was not credible, the court described Elizabeth's account of the July 2 altercation as "disordered," "inconsistent," and "incomplete," and that she had "all sorts of problems recollecting." The court acknowledged that an abuse victim might have fragmented memories, but stated that it did not believe this could explain the problems with Elizabeth's testimony. The court supported its evaluation with the note of the treating physician reflected in Elizabeth's July 3 hospital record that Elizabeth was "not amnestic" to the event. In addition, the court noted that Elizabeth never testified about trying to "beat [Braithwaite] off" or get away, or screaming, or yelling and that she never even "tried to do anything." The court concluded: "[I]t's almost like you were acquiescing and letting this wave of violence happen" which "is very unlike human behavior."

By contrast, the court found Braithwaite's testimony "seamless[ ]" and "consistent" and, unlike Elizabeth's, corroborated by other witnesses. The court found Braithwaite "was untruthful to a certain extent," but did not elaborate.

When Elizabeth's counsel again raised that Elizabeth had not been given the opportunity to present rebuttal evidence to Braithwaite's DVRO request, the court stated: "I'm not going to hear it anymore. You put your best shot up. Okay? This is not

10

going to change. . . . [¶] . . . [¶] . . . Counsel, there's nothing that you can do to rebut this." When Elizabeth's counsel identified additional evidence counsel sought to offer in rebuttal to Braithwaite's DVRO request, the court responded: "Counsel, it doesn't matter to me, because I still have that problem about what actually exists. I have a person who has presented me a photo of him being cut on that night on that day with a date stamp, and the only person to rebut it is your client who has no expertise in this . . . . [¶] . . . [¶] . . . Do not argue with me. I have made my ruling. This is the situation. You cannot get out of that dilemma. The doctor confirmed that he had been cut. Okay? That—between those two things, she said she never cut him. I disagree. Because I don't believe that I've heard any reasonable evidence to suggest that that date stamp was wrong other than her [testimony,] which was a self-serving statement so there is nothing to corroborate her testimony. Nothing. [¶] And there's no way to get out of that dilemma. . . . [¶] And like I said, I found her not to be credible in the totality of the circumstances."

### D. *Elizabeth's Posttrial Filings*

On December 15, 2023, 10 days after trial concluded, Elizabeth moved for reconsideration. The motion included a declaration of a forensic expert regarding the photos from Braithwaite's phone and Braithwaite's medical records from a July 10-11, 2023 hospital stay (unrelated to the July 2 incident). These medical records were in response to a subpoena Elizabeth had timely served during discovery, but that had not been produced until after the trial had concluded.

The forensic expert analyzed the video Elizabeth's counsel had taken during the hallway examination and declared that there were signs the date-and-time metadata of the photos

11

had been manipulated.  Specifically, the expert stated that the "seconds" field in the metadata for all four photos ended in "00" seconds, which was impossible if, as Braithwaite testified, the photos had been taken consecutively.  He also noted that the photos' file names were nonsequential—e.g., "IMG_1409" vs. "IMG_1560."  This, too, was inconsistent with Braithwaite's testimony that he took the photos consecutively.  The expert further declared that, given the suspicious nature of the photographs, only a more comprehensive examination of the native files would "definitively" determine whether they had been falsified.

Braithwaite's July 10, 2023 hospital record included the doctor's description of Braithwaite's body.  The description made no reference to Braithwaite having had a cut, wound, injury or any bandage on his leg.

Braithwaite opposed the motion but proffered no evidence or declarations to support his opposition.

Elizabeth filed an offer of proof identifying evidence that, "[i]f not precluded from doing so," Elizabeth would have presented to the court.  Among them was the full transcript of the approximately one-hour July 7, 2023 phone call, in which Braithwaite discusses Elizabeth's restraining order request and the July 2 incident, but never mentions that Elizabeth was the aggressor or had cut him.  Included also was evidence of pre-July 2, 2023 restraining orders, one in favor of Braithwaite's former girlfriend and one in favor of his former wife, both of which the court had previously indicated would be potentially admissible as rebuttal to Braithwaite's DVRO evidence.  Regarding Braithwaite's testimony that Elizabeth had

threatened him with a knife on October 14, 2021, Elizabeth proffered evidence to show that she was out of town on that date.

At the hearing on the reconsideration motion, Elizabeth also requested the court reopen discovery for the limited purpose of permitting her to examine the metadata of the photos on Braithwaite's phone purportedly depicting the July 2 incident. The court denied Elizabeth's request, as well as her reconsideration motion. In describing the reasons for its ruling, the court noted, inter alia, that the court was "buried" with an "avalanche" of restraining order requests, and that reopening the case "just invites further, I think, situations in which this court would be adding onto a[n] already large caseload."

### E.    *Appeal and Posttrial Developments*

Elizabeth appealed the court's order denying her DVRO request and granting Braithwaite's, as well as its order denying her motion for reconsideration. In February 2014, after Elizabeth appealed,[5] Braithwaite died. Braithwaite's estate has not sought to appear in this appeal. In May 2024, on Elizabeth's motion, the trial court issued an order terminating the DVRO against Elizabeth due to Braithwaite's death.

---

[5] Elizabeth filed two separate appeals—one on January 30, 2024, and one on January 31, 2024—both from the same orders and raising the same issues. The second appeal was filed "in an abundance of caution, and solely to protect against loss of any appellate rights, due to inconsistencies in the trial court case numbers under which certain trial court filings were made. The appeals involve identical parties, identical orders, and identical records." For these reasons, we granted Elizabeth's motion to consolidate the two appeals.

13

## DISCUSSION

Elizabeth challenges both the DVRO issued against her and the court's denial of her DVRO. She argues that the DVRO against her must be reversed because, inter alia, the court violated her right to due process by refusing to permit her to present any evidence in rebuttal to the evidence Braithwaite offered supporting his DVRO request. We agree.

### A. *Mootness*

An appeal "becomes moot when events ' " render[ ] it impossible for [a] court . . . to grant . . . any effect[ive] relief." ' " (*D.P.*, *supra*, 14 Cal.5th at p. 276.) Because an order restraining the conduct of a deceased person cannot " 'have a practical, tangible impact on the parties' conduct or legal status' " (*id.* at p. 277), requiring the court to grant Elizabeth's request for a DVRO against Braithwaite would not provide her "effective relief." (See *ibid.* [describing when relief is "effective"].) The portion of Elizabeth's appeal regarding her request for a DVRO against Braithwaite has thus become moot.

In addition, because the reversal of an order no longer in effect is not effective relief, Elizabeth's appeal is moot to the extent it applies to the (now terminated) DVRO against her as well. (See *D.P.*, *supra*, 14 Cal.5th at pp. 276–277; *San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 564 [recognizing the general rule is that "an appeal from an expired restraining order is moot because the appellate court cannot grant any effective relief from an expired order"].) We nonetheless exercise our discretion to address the merits of this aspect of Elizabeth's appeal. (See *D.P., supra*, at pp. 282-283 [recognizing courts retain the discretion to address moot issues].)

14

We consider the merits because the existence of that DVRO in the past still could have serious negative legal and practical consequences for Elizabeth in the future.  (See *D.P., supra,* 14 Cal.5th at p. 285 [possible future consequences of jurisdictional order that are insufficient to avoid mootness may be considered in deciding whether court should exercise its discretion to reach the merits of a moot appeal].)  In a declaration submitted to this court, she describes how, in ongoing probate proceedings regarding Braithwaite's estate, Tyler cited the DVRO as a basis for opposing her requests for spousal support and letters of administration.  (See *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 209 [finding relevant to mootness inquiry that expired restraining order's "issuance in the first instance could have consequences for [the] mother in this and future court proceedings"].)  Tyler also used the findings underlying the DVRO to file a lawsuit against Elizabeth, although he has since dismissed it.

Also, according to her declaration, Elizabeth's work as a practicing attorney requires her to travel on a "weekly" basis and, as a result of the DVRO, her "Global Entry and TSA PreCheck privileges were revoked."  As of the date of her declaration (November 15, 2024), these privileges still had not been reinstated, despite the October 2024 termination of the DVRO.  The three times she had traveled internationally since the issuance of the DVRO, she was "stopped by U.S. Customs & Border Protection, separated from [her] group, detained in a separate room, interviewed, and then finally released" after "approximately 30-45 minutes."  "On one of those occasions, [Elizabeth] was with business colleagues, and was embarrassed about the possibility that [she] might have to explain to them

15

why [she] was being detained," and "the increased time it takes [her] to get through security" has "impacted [her] ability to book flights with colleagues."

Given these considerations, as well as the importance and nature of the due process rights implicated by her arguments, we exercise our discretion to address the merits of her due process challenge.

## B.    *Due Process*

" 'The term "due process of law" asserts a fundamental principle of justice which is not subject to any precise definition but deals essentially with the denial of fundamental fairness, shocking to the universal sense of justice.' [Citation.]" (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290 (*Carlsson*).)  " 'One of the elements of a fair trial is the right to offer relevant and competent evidence on a material issue.' " (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357 (*Elkins*), italics omitted; see *Carlsson, supra*, at pp. 290–291; see, e.g., *id.* at p. 291 [court "abruptly end[ing] the trial before [party] had finished his presentation, cutting off any opportunity for rebuttal evidence . . . or argument of counsel" was a denial of due process]; *Noergaard v. Noergaard* (2015) 244 Cal.App.4th 76, 87 [court denied mother due process when it did not provide her "the opportunity to offer relevant and competent evidence on" an issue "material" to her opposition to father's petition].)  Such a denial of due process is reversible per se.  (*Elkins, supra*, at p. 1357; *Carlsson, supra*, at p. 291; *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677 (*Kelly*).)

Here, the court "openly violated these precepts."  (*Carlsson, supra*, 163 Cal.App.4th at p. 291.)  We recognize that, because Elizabeth had the burden of proof on her request for a DVRO,

the court would have been entitled to deny a request that she offer additional evidence *in support of that request* after she had rested her case-in-chief. But Braithwaite had the burden of proof on *his* request, so the "full and fair hearing" to which due process entitled Elizabeth on Braithwaite's request includes an opportunity to demonstrate that Braithwaite failed to meet his burden. Indeed, earlier in the proceedings, the court stated it would afford Elizabeth that opportunity.

The fundamental right " ' "to offer relevant and competent evidence on a material issue" ' " is admittedly " ' "[s]ubject to such obvious qualifications as the court's power to restrict cumulative . . . [and] unduly prejudicial matter [citation]." ' " (*Carlsson, supra*, 163 Cal.App.4th at p. 292.) But the court's role as an evidentiary gatekeeper cannot justify the court's actions in this case. The court did not exclude all the specific rebuttal evidence Elizabeth offered—her own testimony and the full transcript of the July 7, 2023 phone call—as cumulative, prejudicial, or otherwise inadmissible. Nor do we see any basis for implied rulings that *all* this evidence is inadmissible. Even assuming the court was entitled to exclude parts of Elizabeth's testimony or parts of the transcript for various reasons, the court's blanket refusal to allow her to offer *any* testimony or any other rebuttal evidence exceeded the bounds of that evidentiary gatekeeping role. "The effect of [this blanket refusal] was to prevent [Elizabeth] from offering evidence to establish [her defense]" and thus violated due process. (*Kelly, supra,* 49 Cal.App.4th at p. 677.)

Nor can the court's refusal to allow any rebuttal evidence be explained by the fact that the parties' cross-requests were primarily based on the same alleged instance of domestic

17

violence.  The court was not required to grant the restraining order to one or the other party; the court could have found each party failed to meet their respective individual burdens of proof. Therefore, the court's conclusion that it would deny Elizabeth's DVRO request could not dictate the outcome of Braithwaite's request and eliminate the need for a hearing on Braithwaite's DVRO request.  Accordingly, even if we accept, for the sake of argument, that the court could have properly concluded at the end of Elizabeth's presentation that it would deny her DVRO request—a ruling we do not review on appeal—this could not justify "abruptly end[ing] the trial . . . without giving [Elizabeth] the opportunity to introduce or even propose additional [admissible] evidence" after hearing Braithwaite's presentation on his request.  (*Carlsson, supra*, 163 Cal.App.4th at p. 292.)

Because this error is reversible per se, and because Braithwaite is deceased, we reverse without addressing the issue of prejudice and without instructions that the court conduct a retrial following remand.

## DISPOSITION

The appeal is dismissed as moot to the extent it addresses the restraining order against respondent Walter Braithwaite.

The order against appellant Sierra Elizabeth is reversed. Appellant shall bear her own costs on appeal.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:


WEINGART, J.


M. KIM, J.

19